UNITED STATES of America,
Plaintiff–Appellee,

v.

Gregorio de Jesus MARES,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Alfredo MARTINEZ–OSUNA,
Defendant–Appellant.

Nos. 88–5318, 88–5372.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 1990.

Decided July 29, 1991.

Stephen M. Hogg, Northridge, Cal., for defendant-appellant Alfredo de Jesus Mares.

David R. Evans, Pillsbury Madison & Sutro, Los Angeles, Cal., for defendant-appellant Alfredo Martinez–Osuna.

Pamela M. Heberton, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, WIGGINS and RYMER, Circuit Judges.

WIGGINS, Circuit Judge:

Alfredo Martinez–Osuna and Gregorio de Jesus Mares appeal their convictions on a two-count indictment charging them with conspiracy to possess with intent to distribute and conspiracy to distribute 1002 grams of heroin (Count 1), and possession with intent to distribute and aiding and abetting the distribution of the heroin (Count 2).

The indictment alleged that the appellants engaged in counter-surveillance activities in furtherance of a transaction involving two codefendants and undercover DEA agents. Both Mares and Martinez–Osuna argue that there is insufficient evidence to support the convictions for conspiracy and possession. Mares separately challenges the propriety of the prosecutor's closing argument, and of the district judge's decision to admit certain expert testimony. Martinez–Osuna contends that the judge's admonishment of counsel during closing argument conveyed the appearance of partiality. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the convictions.

## BACKGROUND

On March 21, 1988, DEA Agent Abenicio Cordova received a phone call from an informant who reported that he knew an individual who wanted to sell one kilogram of heroin. Agent Cordova told the informant to arrange a meeting to conduct the

transaction that evening at a restaurant in Riverside, California. Cordova met that afternoon with other DEA agents and members of the Ontario (Calif.) Police Department to plan for surveillance of the meeting.

At approximately 5:30 p.m., Cordova and another DEA agent went to Hirschel's Restaurant. There they were introduced by the informant to codefendant Rendon–Ramos, who told the agents that the kilogram of heroin was on the way from La Puente and would cost $160,000. Shortly after 5:30, Rendon–Ramos went outside and stood in front of the restaurant.

One hour later, at approximately 6:30 p.m., the informant, who had joined Rendon–Ramos outside, went inside the restaurant and summoned the two agents. Rendon–Ramos pointed to a white Chevrolet parked in the restaurant's lot, and indicated that the heroin was in that car. Rendon–Ramos introduced the undercover agents to codefendant Solorzano–Vega,[1] who walked with Agent Cordova over to the Chevrolet. Once the two men were inside the car, Solorzano–Vega produced a package of heroin from under the back seat. At that time, Cordova gave a prearranged arrest signal, and both Rendon–Ramos and Solorzano–Vega were arrested.

While this transaction was taking place, DEA Agents Benavente and Denley, and Sergeant Fryer and Officer Nottingham of the Ontario Police Department were conducting surveillance in the area surrounding Hirschel's. Agent Denley was positioned inside the restaurant, Agent Benavente was patrolling in a car, Sergeant Fryer was in a car parked in the lot of a Jack-in-the-Box adjacent to Hirschel's, and Officer Nottingham was located in a bank parking lot on the other side of the restaurant. Approximately one half-hour before the arrest, Sgt. Fryer noticed Solorzano–Vega standing in the Jack-in-the-Box parking lot, and glancing repeatedly at his watch. The white Chevrolet was parked nearby in the lot.

Soon thereafter, a gray Toyota with Mexican license plates pulled into the parking lot. The driver and a passenger (later identified to be Mares and Martinez–Osuna, respectively) got out of the car and walked over to talk to Solorzano–Vega. Though Sgt. Fryer could not hear anything the three men said, it appeared that Martinez–Osuna was doing most of the talking. After conversing for several minutes, the men walked over to the Chevrolet, Solorzano–Vega got in the car, and the appellants returned to the Toyota. As Solorzano–Vega drove past the Toyota on the way out of the lot, Martinez–Osuna got out of the car and spoke with him very briefly.

Both cars exited the lot, and Solorzano–Vega turned immediately into the parking lot of Hirschel's. While the agents were preparing to "close the deal," Sgt. Fryer monitored the movement of the Toyota. After passing through Hirschel's parking lot, it circled back past Jack-in-the-Box. The car then exited the lot, and proceeded to make three laps along the same route—through Hirschel's lot, past Jack-in-the-Box, and back onto the street. Sgt. Fryer and Officer Nottingham were in radio communication as the Toyota passed on the far side of the Jack-in-the-Box which blocked Sgt. Fryer's view. Sgt. Fryer noted that Martinez–Osuna, the passenger, turned around and looked out the rear window each time they passed the scene of the drug transaction.

After Rendon–Ramos and Solorzano–Vega were arrested, Agent Benavente located the appellants walking through the parking lot of a Photomat store adjacent to Hirschel's. Upon seeing the officers, the two men exchanged words and began walking in a different direction. When asked by the officers what they were doing, Martinez–Osuna responded that they were going to a restaurant, and Mares said they were going to make a phone call. After the officers placed the appellants under arrest, Mares gave them the keys to the Toyota; no weapons, binoculars, beepers or

1. Rendon–Ramos and Solorzano–Vega, the appellants' two codefendants, pleaded guilty prior to trial, and are not parties to this appeal.

contraband of any kind was found in the car. The officers did find several documents in the car, including a temporary visa issued to Mares that expired on the day of the arrests, and two Mexican driver's licenses.

At trial, the government called as witnesses each of the DEA agents and police officers involved in the transaction. Officer Nottingham and a DEA agent, Stephen Georges, were both qualified as expert witnesses. Agent Georges testified at some length about the role of counter-surveillance in narcotics transactions, and they both testified—Nottingham based on what he had witnessed, and Georges based on the investigation reports and conversations with most of the officials involved—that they were "100% certain" that the appellants were engaged in counter-surveillance activities in connection with the heroin deal. Neither appellant testified in his own defense, and the only defense witness was Agent Denley, who was called very briefly by Mares' counsel. The jury found the appellants guilty on both the conspiracy and possession counts, and this appeal followed.

## DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

Both of the appellants argue that there is insufficient evidence to support their convictions for conspiracy and possession. In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir. 1986). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. *United States v. Fleishman*, 684 F.2d 1329, 1340 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Federico*, 658 F.2d 1337, 1343 (9th Cir.1981), *overruled on other grounds*, *United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). With these principles in mind, we address the convictions for conspiracy and possession.

1. *Conspiracy to possess with intent to distribute.*

Mares and Martinez–Osuna do not dispute the existence of a conspiracy; rather, they argue that the government failed to prove beyond a reasonable doubt that they were connected to that conspiracy. And while the appellants recognize that counter-surveillance activities qualify as acts in furtherance of a conspiracy, *United States v. Perez*, 491 F.2d 167, 171 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974), they argue that there is insufficient evidence that they were engaged in such activities.

Evidence of even a slight connection, if proven beyond a reasonable doubt, is sufficient to convict a defendant of knowingly participating in an established conspiracy. *United States v. Sanchez–Mata*, 925 F.2d 1166, 1167 (9th Cir.1991); *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987). Such connection to a conspiracy may be inferred from circumstantial evidence. *United States v. Batimana*, 623 F.2d 1366, 1368 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980); *Federico*, 658 F.2d at 1344. Mere proximity to the scene of a crime is not sufficient to establish a connection to the conspiracy, but acts that otherwise appear innocent, when viewed in context, may support an inference of guilt. *Id.; Batimana*, 623 F.2d at 1368.

After carefully examining the record and drawing all reasonable inferences in favor of the verdict, we conclude that a reasonable jury could have found that the appellants were engaged in counter-surveillance activities in furtherance of the heroin-dealing conspiracy. While no individual fact or inference is sufficient to establish the appellants' connection to the conspiracy, the facts within the record, when considered in their totality, create a rather persuasive case for guilt.

Clearly the most inculpatory fact concerns the appellants' actual behavior at the scene of the transaction. The surveilling agents and officers testified about a set of facts—which the appellants do not dispute—that strongly suggests that Mares and Martinez–Osuna were engaged in counter-surveillance activity. The appellants spoke at some length with the drug courier minutes before the transaction was to occur, circled the site numerous times, appeared to be watching the deal, and, when asked what they were doing, offered conflicting explanations. Expert witnesses Nottingham and Georges explained how this behavior is consistent with counter-surveillance, and opined that they were certain that the appellants were engaged in such activities. Agent Georges also testified that it is not at all uncommon for people conducting counter-surveillance to be unarmed and unequipped with audio-visual gadgetry.

Moreover, a forensic chemist with the DEA testified that the type of heroin confiscated by the agents is available only in Mexico. This fact, combined with the facts that the appellants are Mexican nationals, drove a car with Mexican plates, and were in the country on a temporary Mexican visa, gives rise to a permissible inference that the appellants were in the country in connection with the heroin transaction. Based on these facts, we believe that it was reasonable for the jury to conclude that Mares and Martinez–Osuna were conducting counter-surveillance in connection with the heroin transaction.

The appellants primarily rely on our decision in *United States v. Penagos*, 823 F.2d 346 (9th Cir.1987), in which we reversed the appellant's convictions for conspiracy and possession on the grounds of insufficient evidence. Penagos, like the appellants here, was alleged to have been a lookout for a drug deal. In *Penagos*, the appellant emerged from an apartment with two codefendants, Guarin and Gonzalez. As Guarin loaded a cardboard box into the trunk of a car, and transferred objects from the trunk to another car, Penagos "stood nearby and appeared to be looking up and down the street." *Id.* at 347. Guarin then drove off to deliver the box containing cocaine, and Penagos and Gonzalez went back into the apartment. That same day, after Gonzalez made a second delivery, Guarin drove to another place with Penagos as a passenger to deliver more cocaine. On their way back to the apartment, Guarin and Penagos stopped at a pay phone, and placed and received calls for almost an hour. Penagos was arrested later that day in the apartment. *Id.* at 347–48.

The government's theory was that Penagos acted as a look-out while the other two men handled and distributed the cocaine. In ruling that the evidence did not support the jury's acceptance of that theory, we distinguished an earlier case affirming a conviction based upon the defendant's counter-surveillance activities. *Perez*, 491 F.2d at 171. Particularly relevant to the instant case is the fact that Penagos was not performing counter-surveillance "at times or places where the risk of detection and capture is greatest, i.e. at meetings between buyers and sellers and during actual transfer of drugs to buyers." *Penagos*, 823 F.2d at 349. This fact is significant because Penagos was supposedly acting as a lookout only while a cardboard box was being loaded into a car.[2] Because that is not an especially suspicious activity, the Court felt that his mere presence did not give rise to an inference that he was engaged in counter-surveillance.

The instant case presents the exact opposite situation; Mares and Martinez–Osuna were present at precisely the time that counter-surveillance is most helpful and most common.[3] In this case, Agent Geor-

---

**2.** The Court dismissed any inference that Penagos was acting as a lookout while driving with Guarin to make a delivery. The Court noted that the police "reported no suspicious activity en route," and found that he did none of the things that a lookout would be expected to do. *Penagos*, 823 F.2d at 348 n. 2. The case against Penagos, then, rested solely on the trunk-loading episode in front of the apartment.

**3.** In *United States v. Hernandez*, 876 F.2d 774 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989), we relied upon this factor to distinguish *Penagos,* and affirmed the

ges, testifying as an expert witness, explained that there are two reasons why drug dealers use lookouts:

> One purpose is to detect the presence of law enforcement personnel.... [A second] purpose is to protect the drugs involved in the delivery, to insure that the delivery is completed, to insure that the money is transferred from the customer or the buyer to the person in that organization delivering the drugs on their behalf, and to insure that the drugs are not stolen or seized by other people that are pretending to be legitimate buyers.

Standing by the car with his codefendants, Penagos was in no better position than the others to serve either purpose. Mares and Martinez–Osuna, on the other hand, were ideally situated both to watch for law enforcement and to protect the drugs and money involved. The common Mexican origin of the appellants and the heroin, combined with the fact that Martinez–Osuna appeared to do the talking when the appellants conversed with Solorzano–Vega, could support an inference that the appellants may have been the actual suppliers or owners of the heroin. But whether or not they were directing or supervising their codefendants, they were certainly in a position to surveil for law enforcement.

We summed up the evidence in *Penagos* by noting that the "defendant's behavior was perfectly consistent with that of an innocent person having no stake or interest in drug transactions." *Penagos,* 823 F.2d at 349. Our overriding concern was the lack of any evidence, direct or circumstantial, suggesting that Penagos was other than a friend of Gonzalez and Guarin accompanying them while they delivered cocaine. He did not even necessarily know that the packages being transported and delivered contained cocaine, and there was certainly no evidence that he knowingly participated in or furthered the scheme.

Here, by contrast, there is significant circumstantial evidence supporting the inference that the appellants were acting in a counter-surveillance capacity. While one can certainly conjure hypothetically plau-

appellant's conspiracy conviction for counter-

sible explanations of the appellants' behavior that are consistent with innocence, that is not the appropriate standard. Rather, our review is limited to the question whether, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the elements of the crime beyond a reasonable doubt. We think that one could, and we therefore hold that there was sufficient evidence to support the conspiracy convictions.

*2. Possession with intent to distribute.*

■ We recently noted the three legal theories that will support a conviction for possession with intent to distribute narcotics: "(1) co-conspirator liability, *United States v. Pinkerton,* 328 U.S. 640, 645–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); (2) aiding and abetting, *United States v. Savinovich,* 845 F.2d 834, 838 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); and (3) exercising dominion and control over the contraband. *United States v. Behanna,* 814 F.2d 1318, 1319 (9th Cir.1987)." *Sanchez–Mata,* 925 F.2d at 1168.

The jury in this case was instructed on a *Pinkerton* theory. In an analogous case, we held that:

> [T]here was ample evidence that a conspiracy existed and that [the appellant] was a party to that conspiracy. [The appellant]'s co-conspirator possessed cocaine for the purpose of furthering the unlawful scheme to distribute the drug. [The appellant], therefore, was properly held responsible for possession.

*United States v. Crespo de Llano,* 838 F.2d 1006, 1019 (9th Cir.1987). It is undisputed that the appellants' two codefendants possessed heroin with intent to distribute; therefore, having affirmed the appellants' conspiracy convictions, and relying on a *Pinkerton* theory of liability, we affirm the convictions for possession with intent to distribute.

## B. PROSECUTORIAL MISCONDUCT

■ Appellant Mares argues that the prosecutor, in her closing argument, im-

surveillance. *Id.* at 779–80.

properly called attention to the fact that he did not testify, and shifted the burden to the appellant to prove his innocence. The relevant passage reads:

> ... I suspect you will be hearing from *defense counsel,* and undoubtedly *they* will try to discredit the witnesses who you heard from, and some how come up with some sort of story about what may have happened in this case.
>
> I'd like you to listen to *their* arguments carefully, and listen to what *they say about what the defendants were doing* meeting with a man at a Jack In the Box, where they didn't eat anything.
>
> Moments before that man went and delivered heroin to undercover DEA Officers ... And why those men then got in the car and drove all around the parking lot three times ...
>
> *Listen to how they explain that, and if they don't come up with an explanation that sounds credible or that meets with your approval, ask yourselves why, and if they don't mention it at all why not.* (Emphasis added).

Defense counsel objected to the comments out of the presence of the jury, and the judge ruled that they were proper. We review a claim that the prosecutor's closing argument violated the appellant's fifth amendment rights de novo. *United States v. Gray,* 876 F.2d 1411, 1416 (9th Cir.1989) (review such a claim "independently and non-deferentially"), *cert. denied,* — U.S. —, 110 S.Ct. 2168, 109 L.Ed.2d 497 (1990).

■ It is fundamental that the fifth amendment prohibits the prosecution from commenting upon a defendant's decision not to testify. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). We must determine whether the challenged comments were "manifestly intended to call attention to the defendant's failure to testify, or [are] of such a character that the jury would naturally and necessarily take [them] to be a comment on the failure to testify." *Gray,* 876 F.2d at 1416 (quoting *Lincoln v. Sunn,* 807 F.2d 805, 809 (9th Cir.1987)). The prosecutor may comment on the defendant's

failure to present exculpatory evidence, provided that the comments do not call attention to the defendant's own failure to testify. *United States v. Soulard,* 730 F.2d 1292, 1306 (9th Cir.1984). And we have held that a "comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir.1988) (citation omitted); *see also Soulard,* 730 F.2d at 1306–07.

■ Applying these standards, we hold that the prosecutor's closing argument did not violate Mares' fifth amendment rights. The challenged portion of the argument was expressly directed at the appellants' "defense counsel"; the prosecutor used the pronouns "they" and "their" in the course of referring to the closing arguments she expected the appellants' attorneys to make. Too, the comments were intended to highlight what the prosecutor felt were weaknesses in Mares' case; they were not in any manner directed at the appellant's failure to take the stand.

■ The comments likewise did not shift the burden of proof to the appellant. It is a common practice for one side to challenge the other to explain to the jury uncomfortable facts and inferences. The prosecutor did not argue that a failure to explain them adequately required a guilty verdict, and, in fact, she reiterated throughout her closing that the burden of proof was on the government. The district judge also instructed the jury that counsel's arguments were not evidence; that the appellant was not required to prove his innocence; and that no inference could be drawn from the appellant's failure to testify. We have held that such instructions are sufficient to cure prejudice resulting from improper prosecutorial argument. *United States v. Fleishman,* 684 F.2d 1329, 1344 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). The district court did not err in ruling that the prosecutor's argument was proper.

## C. SIXTH AMENDMENT CLAIM

Appellant Mares argues that his sixth amendment right to confront the witnesses against him was violated in two ways by the expert testimony of Agent Georges. First, Mares contends that he was unable to cross-examine Georges effectively because the Agent's expert opinion was based in part upon statements made by Rendon–Ramos and Solorzano–Vega, the two non-testifying codefendants, that incriminated the appellant. Mares argues that, because those statements are inadmissible under the rule of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), he was unable to cross-examine Agent Georges as to the basis for his testimony out of a fear that the harmful statements would then be put before the jury. While acknowledging that Federal Rule of Evidence 703 expressly permits an expert to base his testimony on inadmissible evidence, Mares contends Rule 703 does not extend to evidence that is inadmissible under the *Bruton* rule. Second, the appellant contends that he was unable to prepare adequately for his cross-examination of Agent Georges because the government did not announce its intention to call him as a witness until the first day of trial.

At some point during the preparation of this case for trial, Rendon–Ramos and Solorzano–Vega made statements to officials that incriminated the appellants. We do not know the substance of those statements, but the government acknowledges that the statements incriminated Mares and Martinez–Osuna.[4] The government provided Agent Georges with a copy of the state-ments in preparation for his testimony. When Georges was asked on direct examination to explain the basis for his testimony that he was "100 percent certain" that the appellants were engaged in counter-surveillance, he listed a series of facts that take up nearly six pages of trial transcript; he did not, however, mention the statements of the nontestifying codefendants.

The first substantive question that Mares' counsel asked Georges on cross-examination was: "Now, in part, Agent Georges, you're basing your opinion on matters that are not before this jury, is that correct?" After the witness answered that he did not understand the question, the judge called counsel to a sidebar conference and told defense counsel: "[I]f you want to continue that line of questioning, you'll get an instruction that an expert can rely on matters which are not before the jury. So if you want that instruction, you'll get it." After the sidebar, the two defense lawyers did not ask any more about matters not before the jury, and the codefendants' incriminating statements were therefore never introduced at trial. Defense counsel cross-examined the Agent for approximately ten pages about various statements he made and the factual basis for them, and the judge never gave an instruction informing the jury that an expert can base his testimony on inadmissible evidence.

### 1. *The Bruton claim.*

■ Mares' first argument is that Agent Georges should not have been allowed to testify because, having relied, at least in part, upon the incriminating statements of

---

**4.** As we explain below, the statements were never introduced at trial, and they are not part of the record. The best indication we have as to the nature of the statements comes from the following comments made by the prosecutor addressed to the judge and defense counsel on the morning of the second day of trial:

The Government's first witness this morning will be a DEA Agent who will be testifying as an expert, both on the subject in general of what surveillance is and that sort of thing, but he also will be testifying to a conclusion he reached as to these defendants' participation in the conspiracy that's at issue here.

The problem that I foresee and I want to head off at the pass, is that one of the things that the expert relied upon ... were the post-arrest statements made by the two defendants who have pled out in the case. I thought that it was proper to give him those, so that any exculpatory as well as *any inculpatory statements* that were made would further educate him about the case.

The problem that I foresee is that on cross-examination—I mean he certainly on direct will not say that he relied on *statements in which the defendant said that Mr. Osuna provided him with the narcotics.* But on cross-examination, he may be forced to reveal that he relied in part, and that was only a basis for his conclusion on those statements. (Emphasis added).

the nontestifying codefendants, which statements the appellant claims would have been inadmissible under *Bruton,* full and effective cross-examination of the Agent was not possible.[5] While Mares acknowledges that Rule 703 permits expert witnesses, in some circumstances, to rely upon inadmissible evidence in forming an opinion,[6] he contends that the Rule does not extend to statements that are inadmissible under *Bruton.* The appellant claims that permitting Agent Georges to testify created a "catch–22," with the government prohibited by *Bruton* from bringing the statements in on direct, and the defendant unwilling to probe the matter on cross-examination for fear that the statements would seriously damage his case. As such, Mares argues that his right to confront and to cross-examine Agent Georges effectively was violated.

This argument rests upon an assumption that we are not willing to make. Mares simply assumes that Agent Georges, having been shown the codefendants' statements, necessarily relied on them (at least to the extent they were inculpatory). However, we are unable to tell from the record anything about the statements, or which parts, if any, were a basis for the Agent's opinion.

Rule 705 of the Federal Rules of Evidence permits an expert to testify to his opinions and give reasons for those opinions without disclosing the underlying facts, unless the court requires otherwise or they are elicited in cross-examination. The Agent in this case did indicate the bases of his opinion on direct examination, and he did not mention the codefendants' statements. While Mares's concerns about cross-examining the expert about his potential reliance on such statements in front of the jury are understandable, Mares failed to take advantage of steps that were available to make a meaningful record and preserve the point for appeal.

Mares did not ask the court to order further disclosure, nor did he seek to question Agent Georges on voir dire outside the presence of the jury to inquire about the facts underlying his opinion. This could easily have been done, without risk to the defense. Similarly, Mares made no offer of proof with respect to what he expected cross-examination to disclose; nor did he ask the court to require the government to make an offer of proof with respect to what the Agent would respond.[7]

The Sixth Amendment issue Mares raises is troubling, but we cannot deal with issues in a vacuum. As the Federal Rules recognize, *see* Fed.R.Evid. 103(a)(2), (b) & (c), a proper record is all-important. We therefore do not intimate any opinion on the merits of Mares's argument, but instead underscore that the party objecting to an expert's opinion because of perceived defects in its bases must preserve the point by assuring an adequate record for review of what the purported basis is, and whether it is permissible or impermissible.

### 2. *Inadequate preparation time.*

Mares' second argument concerning Agent Georges' testimony is that he had inadequate time to prepare for his cross-examination of the witness. It is

5. In *Bruton,* the Supreme Court held that a defendant's rights under the Confrontation Clause of the sixth amendment were violated when a non-testifying codefendant's confession incriminating the defendant was introduced at their joint trial, despite the judge's instruction that the confession was only to be considered against the codefendant. *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622–23. Not having access to the statements, we cannot say whether they would in fact be inadmissible under *Bruton.*

6. Rule 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*
Fed.R.Evid. 703 (emphasis added).

7. The fact that the judge interrupted counsel's cross-examination of Agent Georges does not affect our disposition. Indeed, the trial judge's comments to counsel at sidebar highlighted the desirability of addressing this issue outside the presence of the jury. Counsel's decision not to pursue the matter further was his own, and it was not due to the judge's actions.

true that the government only informed the court and defense counsel of its intention to call Agent Georges as an expert witness on the first day of trial, and it is also true that the appellant would have been able to spend more time preparing for his testimony if he had been given more notice. It does not follow, however, that the judge's decision to permit the testimony on such short notice violated Mares' sixth amendment rights. Mares must show that he was prejudiced by the allegedly inadequate preparation time; we find that he has failed to make such a showing.

Effective cross-examination of an expert must focus on two main areas, the expert's qualifications and the substance of his testimony. As to Agent Georges' qualifications, the judge instructed the government to make the Agent and his resume available to defense counsel prior to calling him as a witness. As a result, his testimony was put off until the next day of trial. In addition, the appellant took advantage of the opportunity to examine the witness' qualifications in front of the jury during voir dire. And as to the substance of Agent Georges' testimony, Mares was notified in a timely manner that the government intended to call Officer Nottingham as an expert in the field of counter-surveillance. Agent Georges' testimony was largely cumulative, and the appellant has not indicated how additional preparation time would have enhanced his cross-examination of the witness. In addition to these considerations, Mares' failure to request a continuance persuades us that he was not prejudiced by the judge's decision to permit Agent Georges to testify on such short notice. Accordingly, we find no error.

## D. TRIAL JUDGE'S INTERRUPTION OF CLOSING ARGUMENT

■ Appellant Martinez–Osuna separately argues that the trial judge's interruption of his closing argument denied him a fair trial. We will reverse a conviction on this basis only if the record "discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks ...

projected to the jury an appearance of advocacy or partiality." *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.1986) (citation omitted).

The challenged comments took place during the following exchange in the course of counsel's closing argument:

Counsel: There has been testimony in this case that these men are Mexican nationals, they do not care about the laws of this country. But they would care deeply about what would happen to their friend. People in the drug business in Mexico they knew were hurt or killed, and they were concerned, and they drove through that lot—

The Court: Just a moment. There is no evidence of that. You talk about the evidence of this case, not suppositions.

Counsel: I think it is reasonable to infer—

The Court: It is not reasonable to infer from the evidence what you just said. You're not testifying.

We think the judge's comments were entirely appropriate. Far from injecting an unfair bias into the trial, he acted to limit counsel to remarks that could fairly be considered to be supported, at least inferentially, by the evidence. Accordingly, the judge's interruption of counsel's closing argument was not error.

## CONCLUSION

The appellants' convictions are AFFIRMED.