980 F.2d 740
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Benjamin NIEBLA-PACHECO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Julio Cesar QUINTERO-ROMERO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sergio Alejandro LEON-VILLAREAL, Defendant-Appellant.
 Nos. 91-50739, 91-50740, 91-50764.
 United States Court of Appeals, Ninth Circuit.
 Submitted Nov. 3, 1992.*
Decided Dec. 2, 1992.
 
 Before WALLACE, Chief Judge, and TROTT and T.G. NELSON, Circuit Judges.
 
 MEMORANDUM
 
 1
 After a jury trial, Niebla-Pacheco and Leon-Villareal appeal from judgments of conviction for conspiracy to possess with intent to distribute and possession of five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Quintero-Romero appeals from his sentence under the Sentencing Guidelines following his conviction for the same offenses. Niebla and Leon contend that there was not sufficient evidence to support their convictions for either the conspiracy or possession counts. Niebla also argues that the district court erred by admitting certain drug paraphernalia seized from his garage. Quintero contends that the district court erred by increasing his offense level by two points for obstruction of justice pursuant to U.S.S.G. § 3C1.1. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.
 
 
 2
 Evidence is sufficient to support a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bosch, 951 F.2d 1546, 1550 (9th Cir.1991) (internal quotations omitted) (emphasis in original), cert. denied, 112 S.Ct. 2975 (1992). In making this determination, the evidence must be viewed in the light most favorable to the government. Id.
 
 
 3
 Neither Niebla nor Leon dispute the existence of a conspiracy. Rather, they contend that the government has failed to prove beyond a reasonable doubt that they were connected to that conspiracy. "Evidence of even a slight connection, if proven beyond a reasonable doubt, is sufficient to convict a defendant of knowingly participating in an established conspiracy." United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991) (Mares ). The connection to the conspiracy may be inferred from circumstantial evidence. Id. Although mere proximity to the scene of the crime, or association with members of the conspiracy, is not sufficient to establish the necessary connection, "acts that otherwise appear innocent, when viewed in context, may support an inference of guilt." Id.
 
 
 4
 Niebla's conviction for conspiracy is supported by sufficient evidence. In the early afternoon of January 24, 1991, Salcido, one of the conspirators, told Quintero and the confidential informant that he needed to go to the Hoyo Tianguis shopping center and talk with the owner of the narcotics. Upon his return, Salcido told Quintero and Cortes that "he had gotten the green light." Niebla worked at the Vons supermarket located in Hoyo Tianguis. According to Niebla's time sheet, he was at work at the time Salcido met with the owner of the cocaine.
 
 
 5
 Shortly before 8:30 p.m. on January 24, Salcido, Quintero, and Cortes met Agents Marquez and Matus at the Hollies Motel in Calexico. Salcido did not have any cocaine in his possession. Salcido, Cortes, and Leon left to get the first kilogram of cocaine. Salcido drove to the Burger King in Calexico and placed a phone call on a public telephone. Within ten minutes, a blue Buick entered the Burger King parking lot. Salcido went to the car and spoke to the driver. Niebla's house is within five minutes of the Burger King. Agent Mock identified the driver of the car as Niebla. In addition, he checked on the license plate number of the blue car, and learned that the car was registered to Niebla.
 
 
 6
 Salcido got into his car and followed Niebla to Niebla's residence. Agent Turner saw Salcido and Niebla talking under a streetlamp in front of Niebla's residence. Salcido left and returned to the Burger King, where he picked up Leon and Cortes. In the car, Salcido removed a package marked with a horseshoe that contained one kilogram of cocaine. Salcido had not previously displayed any cocaine on his person or in his car.
 
 
 7
 Following the arrests of Salcido, Leon, and Quintero, agents secured the area around Niebla's residence and obtained a search warrant. Niebla gave agents the keys to an El Camino pick up truck registered in his name that was parked in front of his residence. Agents unlocked the passenger-side door and discovered four kilogram packages of cocaine on the front floorboard. The four kilograms found in Niebla's car and the one kilogram recovered by Agents Marquez and Matus at the Hollies motel were each above 95 percent pure and characterized as being "uncut."
 
 
 8
 At the time of his arrest, Niebla had in his pocket a piece of paper with the name "Salcido" on it along with Salcido's home telephone number in Mexico. Also, agents discovered a scale with cocaine residue, bindles, a common cut for cocaine, and other drug paraphernalia in a box hidden in the rafters of Niebla's garage. The items might be used to prepare cocaine for small-scale street sales.
 
 
 9
 The evidence, both direct and circumstantial, indicates that Niebla played a role in the conspiracy. Accordingly, we hold affirm Niebla's conviction for conspiracy.
 
 
 10
 We also affirm Leon's conviction for conspiracy. The government contends that Leon acted as a lookout during the drug transaction. Counter-surveillance activities qualify as acts in furtherance of a conspiracy. See Mares, 940 F.2d at 458. Leon does not dispute that he drove around with the other defendants for four hours as they arranged the narcotics transaction. Rather, he contends that he was a mere passenger in the vehicle and had no involvement in the conspiracy.
 
 
 11
 The record contains ample evidence that Leon knowingly participated in the conspiracy and was not merely along for the ride. In the afternoon of January 24, Julio Quintero, Jose Quintero, Leon, and the confidential informant met at the Quintero residence. They discussed the drug deal and decided that Leon would drive because he had a car. In addition, they agreed that Leon could help with surveillance, and that he would receive $1,000 from the expected $10,000 profit for his efforts.
 
 
 12
 Whenever Salcido, Quintero, and the confidential informant left to meet with the undercover agents, Leon stayed in the back seat of the car "to survey." At the Hollies hotel, the back of Salcido's car was parked so that it afforded a view of both the entrance to the hotel and the street.
 
 
 13
 Following the initial meeting at the Hollies motel, Leon went with Salcido and Cortes to the Burger King. Salcido told Cortes and Leon to wait there until he returned. While Salcido was gone, Leon and Cortes discussed the problems that they were encountering with the narcotics transaction.
 
 
 14
 On the way back to the Hollies motel, Salcido showed Leon and Cortes a kilogram package of cocaine with a horseshoe mark on it. Back at the Hollies, Salcido again parked the car so that it afforded a view of the entrance of the motel and the street. According to Agent Montalvo, Leon constantly shifted around, looking up and down the street that faced the Hollies's entrance and around the front of the car. He also ducked down. The evidence, taken as a whole, is clearly sufficient to support Leon's conviction for conspiracy.
 
 
 15
 Three legal theories will support a conviction for possession with intent to distribute narcotics: (1) co-conspirator liability under United States v. Pinkerton, 328 U.S. 640, 645-47 (1946) (Pinkerton ); (2) aiding and abetting; and (3) exercising dominion and control over the drugs. See Mares, 940 F.2d at 460. The jury in this case was instructed on all three theories.
 
 
 16
 It is not necessary to go beyond the first theory to affirm Niebla and Leon's convictions for possession. In Pinkerton, the Supreme Court held that a party to an unlawful conspiracy may be held responsible for substantive offenses committed by his co-conspirators as part of the unlawful transaction. See Pinkerton, 328 U.S. at 646-48. "[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward." Id. at 646.
 
 
 17
 Here, Niebla did not dispute the existence of the conspiracy and ample evidence suggests that Niebla was a party to the conspiracy. Moreover, it is undisputed that Quintero possessed cocaine with the intent to distribute. Therefore, there is sufficient evidence to find that Niebla was properly held responsible for possession under a Pinkerton theory of liability. See Mares, 940 F.2d at 460. For the same reasons, we also affirm Leon's conviction for possession.
 
 
 18
 The district court admitted evidence seized during the search of Niebla's garage. Niebla characterizes these items as evidence of other wrongful conduct and contends that the district court erred by admitting them pursuant to Federal Rule of Evidence 404(b).
 
 
 19
 However, at trial, Niebla only objected to the introduction of this evidence on the grounds of relevance. Because Niebla failed to make a Rule 404(b) objection in the trial court, we review the admission of the drug paraphernalia under Rule 404(b) for plain error. United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.), cert. denied, 111 S.Ct. 363 (1990). "A plain error is a highly prejudicial error affecting substantial rights." Id. at 501 (internal quotations omitted).
 
 
 20
 We hold that the district court did not commit plain error by admitting this evidence. The existence of drug distribution paraphernalia is probative of intent to enter upon a narcotics distribution scheme. United States v. Savinovich, 845 F.2d 834, 837 (9th Cir.) (Savinovich ), cert. denied, 488 U.S. 943 (1988); United States v. Bernal, 719 F.2d 1475, 1478 (9th Cir.1983) (Bernal ). In addition, the jury could reasonably infer from this evidence that Niebla intended to distribute, as well as possess, cocaine. Savinovich, 845 F.2d at 837; Bernal, 719 F.2d at 1478. Consequently, Niebla has failed to demonstrate that the introduction of this evidence was highly prejudicial.
 
 
 21
 Finally, we affirm Quintero's sentence. Quintero's presentence report recommended an offense level of 32 pursuant to sections 2D1.1(c) and 2D1.4 of the Sentencing Guidelines. The district judge increased Quintero's offense level by two points for obstruction of justice.
 
 
 22
 Section 3C1.1 directs the sentencing judge to add two levels if "the defendant wilfully obstructed or impeded, ... the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Application Note 3(b) specifically includes committing perjury as an example of obstructing justice. The district judge enhanced Quintero's sentence because he determined that his testimony at trial was "absolutely untrue." We review the district court's factual determination that Quintero obstructed justice for clear error. United States v. Barbosa, 906 F.2d 1366, 1369 (9th Cir.), cert. denied, 111 S.Ct. 394 (1990).
 
 
 23
 Quintero testified that he had never been involved in a drug transaction before, that he only did this one because his mother had leukemia and the family had to pay staggering medical bills, and that the confidential informant set up the crime and induced him to help so he could supply the Quintero family's need for money.
 
 
 24
 The evidence supports the district judge's finding that Quintero lied during his testimony. Although he stated that he had never been involved in a drug transaction before, Quintero told Agent Marquez that he had checked on the prices of cocaine in San Diego and knew it was cheaper there. He also discussed the price of marijuana with Agent Marquez. Moreover, there is no evidence in the record that Quintero ever mentioned his mother's illness or his need for money to pay her medical bills at any time prior to his testimony at trial. Finally, Quintero's testimony that Leon was not involved in the deal and did not conduct any counter-surveillance directly contradicted the testimony of both the confidential informant and Agent Montalvo.
 
 
 25
 Quintero's testimony was contradicted by other witnesses and by his own actions. The district court's finding that Quintero lied is also consistent with the jury's rejection of Quintero's entrapment defense. Thus, the district court's finding that Quintero obstructed justice was not clearly erroneous and so we affirm the two-level increase in Quintero's offense level.
 
 
 26
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4