107 F.3d 878
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Enrique NAVARRO-MARTINEZ, Defendant-Appellant.
 No. 95-50388.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 6, 1997.
Decided Feb. 25, 1997.
 
 1
 Before: FLETCHER and TROTT, Circuit Judges, and JENKINS,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Enrique Navarro-Martinez ("Navarro"), and a codefendant, Jorge Alberto Silva ("Silva"), were convicted of conspiracy to possess and possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1). Navarro was sentenced to 292 months imprisonment. On appeal, Navarro, citing Bruton v. United States, 391 U.S. 123 (1968), claims that testimony of a federal drug enforcement agent regarding his codefendant's (Silva's) post-arrest statements to the agent violated the Confrontation Clause of the Sixth Amendment. Navarro also claims that there was insufficient evidence to support his convictions. Additionally, Navarro argues that he was prejudiced by the district court's ruling that he was not entitled to discovery of certain documents relating to the Government's confidential informant. Assuming that the agent's testimony resulted in a Bruton error, we find that any such error was harmless. Because any prejudice Navarro may have suffered as a result of any error was slight when compared to the evidence supporting his guilt, we affirm his convictions.
 
 I. FACTUAL BACKGROUND
 
 4
 In late November of 1993, a confidential informant ("CI") informed the Drug Enforcement Administration ("DEA") that a man named Juan Camarena Rojas ("Rojas") wanted to sell him methamphetamine. On December 15, 1993, the CI met Rojas to obtain a sample of the methamphetamine. DEA agent Peter Speer and other DEA agents observed and tape recorded this meeting. The CI and Rojas agreed to meet at a Denny's restaurant in Ontario, California the following day to consummate the transaction. The following day, December 16, 1993, Agent Speer observed Rojas and the CI meet in the parking lot of the Denny's. Soon thereafter they were joined by codefendant Silva and all three entered the restaurant together. While they were in the restaurant, Agent Speer observed Navarro "standing around the front and milling about the back of the restaurant." A half-hour later all three men exited the restaurant. Silva then met Navarro in the parking lot and they left together in a car. Rojas and the CI remained in the parking lot. Thirty minutes later Silva returned alone. Agent Speer next observed the arrival of a green pick-up truck. Navarro and Estevan Luis Martinez ("Martinez") exited from the truck and joined Rojas, Silva, and the CI in conversation. Soon thereafter all participants drove away.
 
 
 5
 Later that night, Rojas and the CI agreed to meet the next day at a Denny's restaurant in Riverside to complete the sale and purchase. The DEA once again arranged surveillance. On December 17, 1993, the CI was first to arrive. He parked and entered Denny's. A few minutes later, as the CI was leaving the restaurant, Martinez and Luis Moses Avila ("Avila") arrived in the parking lot. Next, Rojas entered the parking lot. Soon thereafter, DEA agents observed Silva and Navarro enter the lot in a white Pontiac Grand Prix. After parking next to the CI, Silva and Navarro exited the car, greeted and shook hands with the CI. The agents then observed Navarro, Silva, and the CI walking towards the rear of the car. The agents continued to observe as the trunk of the Grand Prix was opened. Navarro, Silva, and the CI appeared to engage in conversation while looking into the now open trunk.
 
 
 6
 Meanwhile, Martinez and Avila had crossed the street and were watching the Denny's parking lot. Silva left the CI and Navarro and walked across the street to speak with Martinez and Avila. At the same time, Navarro left the CI and went to speak with Rojas. A few minutes later, both Navarro and Silva returned to the trunk area of the Grand Prix where the CI had been waiting. The CI than gave a signal to DEA agents who moved in and arrested Silva and Navarro as they stood by the Grand Prix. In the trunk of the Grand Prix, in open view, the agents found a laundry basket containing approximately fourteen pounds of methamphetamine.
 
 
 7
 Navarro, and the four others, Silva, Martinez, Avila, and Rojas, were indicted and charged with, among other things, conspiracy to possess and possession of methamphetamine with intent to distribute. Rojas was eventually dropped as a defendant; the four remaining defendants pled not guilty. A joint trial commenced on November 16, 1994. Silva took the stand and testified at this first trial and was subject to cross-examination. For reasons unrelated to this appeal, the court declared a mistrial and set a new trial date. Thereafter codefendants Martinez and Avila entered guilty pleas.
 
 
 8
 On April 25, 1995, the second trial of the remaining defendants, Navarro and Silva, began. Defendant Silva decided not to take the stand the second time around. Defendant Navarro, however, offered the transcript of Silva's testimony given at the first trial, including the direct and cross-examinations. In the proffered testimony, Silva said that he drove Navarro's car to the Denny's in Riverside on December 17, 1993, to deliver a laundry basket to the CI. The basket was in the trunk of Navarro's car and Silva was to "just open the trunk and give the [the basket] to [the CI]." Silva at the first trial stated that Navarro came with him only because "[Navarro] didn't want to lend the car to me," and that Navarro went with Silva so that Navarro's wife would not "get angry" at him for loaning out the car. Silva also testified that Martinez and Navarro had agreed to meet at the same Denny's to "go for some pots."
 
 
 9
 As rebuttal to the Silva testimony, the Government had DEA agent Burns relate an inconsistent statement given by Silva to Burns, post-arrest. The district court limited Agent Burns' testimony to portions of Silva's statement that would contradict the earlier proffered testimony. Before the court allowed this testimony, it cautioned the jury that Agent Burns' testimony was "admissible only to impeach [Silva's] testimony, that is, as it may bear upon his credibility.... [and is] not offered to establish the truth of the earlier statements."
 
 
 10
 Agent Burns then testified that Silva told him that "he got the methamphetamine from Mr. Martinez and Mr. Avila." Agent Burns also testified as follows:
 
 
 11
 Q. Did defendant Silva tell you why--after he showed the methamphetamine to the informant why he crossed Madison Avenue to talk to Avila and Martinez?
 
 
 12
 A. Yes, he did.
 
 
 13
 Q. What did he tell you about that?
 
 
 14
 A. Mr. Silva stated that he crossed Madison Avenue to tell Mr. Navarro and Mr. Avila that the informant was upset because there were only 14 pounds of methamphetamine instead of the 20 that had been negotiated for.
 
 
 15
 (Emphasis added). No one objected to the question or the answer at this time.
 
 
 16
 On May 4, 1995, the jury returned guilty verdicts against Silva and Navarro. On August 7, 1995, Navarro was sentenced to 292 months imprisonment and five years of supervised release.
 
 II. STANDARD OF REVIEW
 
 17
 This Court reviews de novo any alleged violations of the Confrontation Clause under Bruton. United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir.), cert. denied, 506 U.S. 890 (1992). In addition, a challenge to the sufficiency of the evidence requires this Court to search the record to determine whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendant guilty of the crime charged beyond a reasonable doubt. United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991).
 
 III. DISCUSSION
 A. Alleged Bruton Error
 
 18
 The parties agree that Martinez, not Navarro was across the street and that Agent Burns misspoke. The Government argues that by time the jury heard this statement, it had heard over and over again that it was Martinez and Avila that Silva met across the street and, therefore, the jury could not have been confused by Agent Burns' misstatement. Moreover, Navarro himself offered the testimony of Silva at the first trial--testimony that on numerous occasions placed Navarro at the initial meeting and at the final display of methamphetamine. Although Navarro's counsel did engage in a limited cross-examination of Agent Burns, he did not challenge or attempt to correct the factual misstatement.[1] Nevertheless, for purposes of our analysis, we will assume that a Bruton error has occurred. See Bruton v. United States, 391 U.S. 123, 126 (1968) (admission of post-arrest statement or confession of nontestifying codefendant implicating defendant violates Confrontation Clause).
 
 
 19
 Assuming but not finding that the misstatement amounts to a Bruton error, our analysis then focuses on whether any such alleged error was harmless in light of the circumstances of the case. See Brown v. United States, 411 U.S. 223, 231 (1973); see also Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir.1986) (error is harmless where "other evidence of guilt was overwhelming" and prejudice from statement was "slight by comparison") (quoting United States v. Guerrero, 756 F.2d 1342, 1348 (9th Cir.), cert. denied, 469 U.S. 934 (1984)).
 
 
 20
 In this case, the independent evidence against Navarro was overwhelming. Navarro attended a meeting on December 16, 1993, with Silva, Rojas, Martinez, and the CI at the Denny's in Ontario. At that meeting, Silva, Rojas, and the CI discussed the drug transaction. The next day, December 17, 1993, Navarro arrived with Silva to meet the CI at the Denny's in Riverside, riding in a white Pontiac Grand Prix belonging to Navarro that contained fourteen pounds of methamphetamine in the trunk. After arriving at the Denny's, Navarro got out of his car and shook hands with the CI. He then walked to the rear of his car and stood with Silva and opened the trunk and showed the CI the drugs. The methamphetamine was plainly visible in the trunk. Thus, the evidence against Navarro shows that: (1) he was present at the initial meetings at which the drug transaction was negotiated; (2) he spoke at length with the CI and Silva during the negotiation stages; (3) he left the site of the negotiations and returned in his car carrying the drugs in his trunk; and (4) he joined the CI and Silva at the trunk of his car when the drugs were presented.
 
 
 21
 Moreover, it does not appear that Agent Burns' one factual misstatement, to which no one objected, had any prejudicial effect on the jury. Although the statement places Navarro at the location, by the time the jury heard this testimony it had already been presented with extensive evidence showing Navarro's presence. Moreover, as the Government cogently argues, by time the jury heard the misstatement it had repeatedly heard testimony that it was Martinez and Avila that Silva met across the street. Thus, any prejudice Navarro may have suffered as a result of the factual misstatement is slight when compared to evidence of his guilt. Accordingly, even assuming the misstatement resulted in Bruton error, any such error was harmless. See Guerrero, 756 F.2d at 1348.
 
 B. Sufficiency
 
 22
 The very same evidence summarized above was sufficient to convict Navarro of the conspiracy and possession charges. Evidence of Navarro's presence at the December 16, 1993, meeting, coupled with evidence of his active participation at the December 17, 1993, meeting at which the methamphetamine was delivered, supports a the jury's finding that Navarro participated in the conspiracy. See Reyes-Alvarado, 963 F.2d at 1188. In addition, it is undisputed that fourteen pounds of methamphetamine were found in the trunk of Navarro's car. Moreover, Navarro escorted the CI to the open trunk of the car where the methamphetamine was located in plain sight. Navarro looked into the trunk with the CI and remained at the trunk throughout the purported delivery. Such evidence supports the jury's finding that Navarro knowingly had possession of the methamphetamine and intended its distribution. Id. Thus, after reviewing the record and drawing all reasonable inferences in favor of the Government, we conclude that a reasonable jury could have found that Navarro was engaged in the conspiracy and possessed the methamphetamine with intent to distribute as charged in the Indictment.
 
 IV. CONCLUSION
 
 23
 After reviewing the record and drawing all reasonable inferences in favor of the Government, it appears that a reasonable jury could have found that Navarro was a participant in the conspiracy and possessed the methamphetamine with an intent to distribute. And, assuming but not finding that there may have been an inadvertent Bruton violation, any such error was harmless. Moreover, the district court was correct when it denied Navarro's discovery request.[2] Accordingly, Navarro's convictions are AFFIRMED.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 This failure to correct or, arguably, even notice the alleged Bruton error buttresses the argument that given the circumstances of the testimony the misstatement was so inadvertent and harmless that even the defense did not understand the misstatement to implicate Navarro rather than Martinez
 
 
 [2]
 Following in camera review, the district court held that the materials Navarro requested did not contain any exculpatory information. Our independent review of this material confirms this ruling. Thus, the materials were not discoverable by Navarro under Brady v. Maryland, 373 U.S. 83 (1963). In addition, because the CI did not testify at Navarro's trial, the materials were not discoverable for impeachment purposes under Giglio v. United States, 405 U.S. 150 (1972)