988 F.2d 123
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Francisco Oscar DESSENS-FIMBRES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Oscar Alfredo LIERA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raul MARTINEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rafael Jose Rivera-CORONADO, Defendant-Appellant.
 Nos. 91-10353, 92-10055, 92-10123 and 92-10172.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 1, 1993.
Decided Feb. 26, 1993.
 
 Appeal from the United States District Court for the District of Arizona, Nos. CR-90-00454-EHC, CR-90-00454-01-EH; Earl H. Carroll, District Judge, Presiding.
 D.Ariz.
 AFFIRMED.
 Before ALARCON, RYMER and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 I.
 BACKGROUND
 
 2
 Appellants, Francisco Oscar Dessens-Fimbres (Dessens), Oscar Alfredo Liera (Liera), Raul Martinez (Martinez), and Jose Rivera-Coronado (Coronado), challenge their convictions for conspiracy and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. A federal grand jury returned an indictment against the four appellants, charging Liera and Dessens with conspiracy and possession with intent to distribute cocaine (counts one and three), Martinez with conspiracy and possession of eleven kilograms of cocaine (counts two and three), and Coronado with conspiracy (count three).
 
 
 3
 Trial commenced on February 20, 1991. After several defendants informed the court that they were negotiating plea agreements, the trial recessed on February 21, 1991. Dessens proceeded to trial alone and the jury convicted him of both the conspiracy and possession counts. On September 4, 1991, a jury trial commenced against Liera, Martinez and Coronado. The jury found all three defendants guilty as charged in the indictment.
 
 
 4
 Defendants now appeal alleging various constitutional and evidentiary errors. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm all convictions.
 
 II.
 DESSENS
 A. Peremptory Challenges
 
 5
 Dessens argues that the Government unconstitutionally exercised its peremptory challenges to exclude five of six Hispanic jurors and that the district court erred in determining that the Government had established race-neutral explanations for its strikes. We disagree.
 
 
 6
 "The district court's findings regarding purposeful discrimination in the jury selection process are findings of fact which will be set aside only if clearly erroneous." United States v. Power, 881 F.2d 733, 739 (9th Cir.1989). We accord great deference to the district court's findings regarding purposeful discrimination. Batson v. Kentucky, 476 U.S. 79, 98 n. 21 (1986).
 
 
 7
 Batson established a three-part analysis to determine whether the Government has exercised its peremptory challenges in violation of the Equal Protection Clause. Id. at 96-98; see also United States v. Bishop, 959 F.2d 820, 824 (9th Cir.1992). First, the defendant must establish a prima facie case of purposeful discrimination; second, the prosecutor must give a race-neutral explanation for the challenges; and finally, the district court must determine whether the defendant has established purposeful discrimination. Bishop, 959 F.2d at 824. We focus our review upon the latter two steps of the analysis because once the prosecutor offers a race-neutral explanation for the peremptory challenges, the initial inquiry as to whether the defendant has established a prima facie case becomes moot. Id. (quoting Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991)).
 
 
 8
 A race-neutral explanation is one "based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez, 111 S.Ct. at 1866. The Government's explanation for striking jurors must be "clear and reasonably specific." United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir.1989). However, the prosecutor's explanations "need not rise to the level justifying use of a challenge for cause." Power, 881 F.2d at 740 ("The fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror, does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions" (internal quotations and citations omitted)). In order to decide whether the prosecutor has presented race-neutral grounds for its peremptory challenges, this court determines whether there is a "nexus between the jurors' characteristic ... and their possible approach to the specific trial." Bishop, 959 F.2d at 825.
 
 
 9
 In this case, the prosecutor used its peremptory challenges to strike five Hispanic jurors, while two Hispanic jurors remained in the jury pool and one served on the jury panel. Although the percentage of Hispanic jurors struck may be significant in determining whether the defendant can establish a prima facie case of purposeful discrimination, it does not end the inquiry because once the prosecution gives an explanation for its strikes, this court must focus upon whether that explanation is race-neutral. See Chinchilla, 874 F.2d at 698, 698 n. 4; see also Bishop, 959 F.2d at 824.
 
 
 10
 (1) Salazar
 
 
 11
 Of the five Hispanic jurors struck, Salazar is the only one about which the district court expressed reservation. The prosecutor explained that Salazar troubled him because he had served in the military and had gotten out because of a breach of contract. The prosecutor was concerned that it may have been a dishonorable discharge. Although the district court judge expressed regret for failing to question Salazar further regarding his involvement with the Government, he noted that Salazar did give a strange answer.
 
 
 12
 The district court did not clearly err in refusing to find purposeful discrimination with regard to Salazar. As we have stated, a peremptory challenge may rest on nothing more than the prosecutor's instincts about a juror as long as the reason for the challenge is not pretextual. Power, 881 F.2d at 740; see also Hernandez, 111 S.Ct. at 1867-68 (holding there was no purposeful discrimination when the prosecutor struck two Latino jurors because their demeanor, coupled with the fact that they were bilingual, created concern that they would not accept the interpreter as the final arbiter of witness testimony).
 
 
 13
 Similarly, the prosecutor in this case relied upon his instincts and Salazar's demeanor when he decided to strike him. His explanation was not pretextual because Salazar's involvement with the Government could have affected his judgment and resulted in prejudice against the prosecution. Thus, there was a nexus between the juror's characteristics (demeanor and prior Government involvement) and his possible approach to the trial. Hernandez, 111 S.Ct. at 1871 ("[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" (internal citations omitted)).
 
 
 14
 (2) Aguilar
 
 
 15
 The prosecutor explained that he was concerned about Aguilar because she had expressed ambiguous feelings about drugs. Although recognizing that drugs are illegal, it was her belief that if people want to do drugs, it is their own business.
 
 
 16
 The prosecutor's explanation was race-neutral because he was troubled by Aguilar's attitude toward drugs. Again, there was a nexus between her attitude and potential approach to a trial in which the defendants were accused of drug-related crimes. The district court did not clearly err in finding no purposeful discrimination.
 
 
 17
 (3) J. Gonzalez
 
 
 18
 The prosecutor gave a very detailed explanation of his reason for striking J. Gonzalez, including potential biases and prejudices based upon her personal experience with police officers and their attitude toward Hispanics. There was a connection between the convictions of her two brothers and the possible effect on her judgment in this case. United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir.) (proper to exclude a juror who had a brother in prison for a robbery conviction), cert. denied, 484 U.S. 914 (1987). "[A] prosecutor may use peremptory challenges when he cannot formulate and sustain a legal objection to a juror, and yet has reason to question the impartiality of a juror due to his habits and associations." Id.
 
 
 19
 (4) G. Gonzales
 
 
 20
 G. Gonzales had indicated her concern about police entrapment because her cousin was currently in jail for his involvement in stolen goods. She wasn't certain if the recent crime involved drugs or not, but she suggested that he may have been entrapped. The prosecutor gave a race-neutral explanation for striking G. Gonzales based upon his concern that she had predisposed notions about police entrapment.
 
 
 21
 Dessens contends G. Gonzales' feelings regarding entrapment were irrelevant because none of the defendants intended to raise entrapment defenses. However, because undercover agents and an informant were instrumental in the defendants' arrest, G. Gonzales' attitude toward entrapment would not only be relevant, but could have resulted in prejudice against the Government, affecting her ability to be impartial. Furthermore, as with J. Gonzalez, a relative's conviction is a proper basis for striking a potential juror. Vaccaro, 816 F.2d at 457.
 
 
 22
 (5) Estrada
 
 
 23
 Finally, Dessens claims Estrada was struck improperly. The prosecutor explained that Estrada was a long-time drug user. He had indicated that if people want to do drugs, it is their business. Similar to Aguilar, the prosecutor had a race-neutral reason for striking Estrada because of his prior drug use and potential bias favoring drug use. Even if he didn't favor drug use, his answer suggested that he may not have been willing to convict someone else for involvement with drugs.
 
 
 24
 Although the fact that one Hispanic juror was left on the jury is evidence of a lack of discriminatory motive, it does not render an error harmless because striking even one juror based on racial discrimination constitutes a violation of the Equal Protection Clause. Bishop, 959 F.2d at 827. In this case, the defendants struck Hispanic jurors and the district court excused three other Hispanic jurors, thereby reducing the number of Hispanics eligible to serve.
 
 
 25
 In overruling the defendant's objection, the district court determined that a lawyer with reasonable judgment could have excluded those jurors based solely upon their answers and without regard to race. We agree. The prosecutor gave sufficiently clear, reasonably specific, and race-neutral explanations for all of the strikes. See Chinchilla, 874 F.2d at 698. Therefore, the district court properly found the prosecutor did not intentionally discriminate against the potential Hispanic jurors.
 
 B. Right to Remain Silent
 
 26
 Dessens claims that the district court erred in denying his motion for a new trial because codefendant Martinez's counsel elicited a statement from Agent Sands on cross-examination regarding the fact that none of the defendants would talk to the police subsequent to their arrest.[1]
 
 
 27
 We review the district court's decision denying a motion for a new trial for an abuse of discretion, United States v. George, 960 F.2d 97, 101 (9th Cir.1992), and the defendant carries a significant burden to show that the district court abused its discretion. United States v. Endicott, 869 F.2d 452, 454 (9th Cir.1989).
 
 
 28
 "The Supreme Court has clearly stated that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving Miranda warnings, violates the Due Process Clause...." United States v. Newman, 943 F.2d 1155, 1157 (9th Cir.1991) (internal quotations and brackets omitted) (citing Doyle v. Ohio, 426 U.S. 610 (1976)).
 
 
 29
 In Greer v. Miller, 483 U.S. 756 (1987), the Supreme Court held there was no violation of the defendant's right to remain silent after arrest because: (1) the court sustained the objection to the only question which referred to the defendant's post-arrest silence; (2) there were no further questions or arguments regarding the defendant's silence; (3) the court issued a curative instruction to the jury advising them to disregard questions to which objections were sustained; (4) the prosecutor was not allowed to draw attention to the defendant's silence; and (5) his silence was not submitted as evidence from which the jury was allowed to draw an inference as to his guilt. Id. at 764-65.
 
 
 30
 In Newman, this court held that the defendant's due process right to remain silent was violated because: (1) the prosecutor unnecessarily elicited testimony from the agent regarding the defendant's post-arrest silence on three separate occasions; and, (2) there were questions and answers focusing upon his silence. Id. at 1157-58. Newman distinguished Greer because the conduct in Newman was "much more egregious." Id. at 1157.
 
 
 31
 In this case, codefendant Martinez's attorney elicited the following testimony from Agent Sands on cross-examination:
 
 
 32
 Q. Do you know if my client refused to talk to Agent Rodriquez?
 
 
 33
 A. I wasn't there, particularly, no. But it was my understanding that none of the defendants would talk to Rodriquez.
 
 
 34
 We conclude that no error occurred as a result of the above testimony. First, the other defendants, including Dessens, did not object either to the question or the answer and the examination continued until the noon recess when Dessens objected and made his motion for mistrial. Second, when the district judge asked Dessens' attorney if he wanted the answer stricken and the jury admonished to disregard the answer, he refused. Third, he did not request a curative instruction.
 
 
 35
 Fourth, the prosecutor did not draw attention to Agent Sands' response. He did not thereafter refer to it either during the trial or in closing argument, unlike the situation in Newman. Agent Sands' comments were very limited and did not even refer to Dessens specifically; rather, he mentioned the defendants generally. It was an isolated comment made during a lengthy trial and prior to a seven-day recess. Finally, Dessens' silence was not submitted to the jury as evidence from which they were allowed to draw an inference of guilt. Neither the court nor the prosecutor stressed an inference of guilt from the silence as is prohibited by Griffin v. California, 380 U.S. 609, 615 (1965). Therefore, the district court did not abuse its discretion in denying Dessens' motion for a new trial.
 
 C. Improper Comments
 
 36
 Dessens next argues he suffered prejudicial error because Agent Sands testified that the informant feared for his safety because Dessens and his co-conspirators had threatened to harm him if anything went wrong with the deal.
 
 
 37
 "We consider first whether the statements were improper and, if so, whether it is more probable than not that the prosecutor's conduct 'materially affected the fairness of the trial.' " United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir.1986) (quoting United States v. McKoy, 771 F.2d 1207, 1212 (9th Cir.1985)).
 
 
 38
 It is improper for a prosecutor to suggest that a defendant is involved in threatening witnesses if there is no evidence of such conduct at trial. Id. In addition, it is constitutional error for a prosecutor to attack repeatedly the integrity of defense counsel and the defendant's right to counsel. Bruno v. Rushen, 721 F.2d 1193, 1194-95 (9th Cir.1983), cert. denied, 469 U.S. 920 (1984).
 
 
 39
 In this case, Agent Sands' testimony regarding threats to the informant did not constitute error. Dessens' own attorney elicited the testimony of which he now complains. Although the prosecutor made further inquiry about the threats on cross-examination, he was entitled to question Sands on the subject because it was within the scope of direct examination. See Fed.R.Evid. 611(b). Furthermore, the prosecutor elicited no additional testimony other than what Dessens had elicited on direct and the district court sustained Dessens' objection as soon as the questioning went beyond permissible bounds. Finally, there were no other questions or arguments on that subject.
 
 
 40
 Similarly, Dessens' claim that error occurred because the prosecutor attacked defense counsel is without merit. He cites Rushen in support of his argument; however, in that case, this court held error occurred because the prosecutor had repeatedly attacked both defense counsel and the defendant's right to counsel. Rushen, 721 F.2d at 1194-95. In the instant case, the testimony at issue did not refer to the specific defense attorneys in the case; rather, it referred only to "attorneys" in general. Again, this reference was elicited by Dessens' own counsel. Hence, the district court did not abuse its discretion in denying Dessens' motion for a new trial based upon prosecutorial misconduct.
 
 D. Base Offense Level
 
 41
 Finally, Dessens contends the district court erred in setting his base offense level at thirty-six because it improperly determined that the conspiracy was capable of producing fifty kilograms of cocaine.
 
 
 42
 We review de novo the district court's interpretation of the Sentencing Guidelines, United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, 112 S.Ct. 2954 (1992), as well as its application of the Guidelines. United States v. Kohl, 972 F.2d 294, 297 (9th Cir.1992). However, "[w]hether a defendant was 'reasonably capable of producing the negotiated amount' of drugs in an incomplete drug conspiracy is a factual determination which we review for clear error." United States v. Monroe, 943 F.2d 1007, 1018-19 (9th Cir.1991), cert. denied, 112 S.Ct. 1585 (1992).
 
 
 43
 The Sentencing Guidelines provide that where "a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." U.S.S.G. § 2D1.4 (Nov. 1990).[2] The application note states:
 
 
 44
 If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.
 
 
 45
 U.S.S.G. § 2D1.4, comment. (n. 1) (Nov. 1990). In addition, if the defendant is convicted of the conspiracy, U.S.S.G. § 1B1.3, comment. (n. 1) (Relevant Conduct) applies, thereby making the defendant responsible for the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." Therefore, there are two prerequisites for setting the offense level based upon a certain amount: (1) the defendant and his co-conspirators intended to deliver the stated amount; and, (2) they were capable of producing that amount. Monroe, 943 F.2d at 1019. We have stated that "the offense level for a conspiracy is determined by the amount that a defendant conspired to sell and not by the amount ultimately sold." United States v. Alvarez-Cardenas, 902 F.2d 734, 736 (9th Cir.1990).
 
 
 46
 In this case, the record reflects both the co-conspirators' intent to deliver fifty kilograms of cocaine as well as the fact that they were capable of producing that amount. Initially, on November 6, 1990, the informant and Liera discussed a drug transaction involving fifty kilograms of cocaine at $22,000 per kilogram. The informant further testified that the fifty-kilogram deal was arranged through Oscar Lopez (Lopez) and that Liera indicated to the informant that it would be possible to supply fifty kilograms. At a November 9th meeting, Liera told him he had eighteen kilograms and that he would come up with another thirty-two kilograms. On November 14th, Lopez placed a call to Liera and told him the informant had the money and was ready to conclude the transaction for fifty kilograms.
 
 
 47
 As the deal progressed, Liera again told the informant he was working to get the additional thirty-two kilograms to match the fifty they had agreed upon in the original deal. Even Dessens indicated to the informant that he was helping Liera obtain the eighteen kilograms and would probably locate the other thirty-two through some of Dessens' connections. Again, immediately preceding the arrest, Lopez asked one of the undercover agents if he was still interested in purchasing an additional thirty kilograms of cocaine and when the agent responded in the affirmative, Lopez told him the thirty kilograms would be "in town tomorrow."
 
 
 48
 Ultimately, the co-conspirators were arrested after they delivered twenty kilograms of cocaine. The fact that the co-conspirators said they had eighteen kilograms but would produce thirty-two additional kilograms, coupled with the fact that they did produce two additional kilograms prior to their arrest, indicates that they not only intended but were capable of producing the fifty kilograms initially agreed upon. Therefore, the district court did not clearly err in setting Dessens' offense level based upon fifty kilograms of cocaine.
 
 III.
 LIERA
 A. Plea Agreement
 
 49
 Liera contends the district court erred in rejecting his plea agreement. We disagree.
 
 
 50
 It is within the sound discretion of the district court to reject or accept a plea agreement. Santobello v. New York, 404 U.S. 257, 262 (1971); United States v. O'Brien, 601 F.2d 1067, 1069 (9th Cir.1979). "There is, of course, no absolute right to have a guilty plea accepted." Santobello, 404 U.S. at 262. Whether the district court accepts or rejects a plea agreement is a matter of discretion. United States v. Barker, 681 F.2d 589, 592 (9th Cir.1982); O'Brien, 601 F.2d at 1069.
 
 
 51
 Defendants have no right to plead guilty; rather, they have the right to make an offer to plea and have the district court, within its discretion, determine the propriety of the plea. United States v. Alvarado-Arriola, 742 F.2d 1143, 1144 (9th Cir.1984). Furthermore, we have reasoned that "[i]t is the duty of the court, in viewing the appropriateness of the plea, to inquire into the sufficiency of its factual basis." Id. If the court determines that the factual basis is lacking, rejection of the plea is appropriate. Id.
 
 
 52
 The Sentencing Guidelines aide the district court in determining whether to accept a plea agreement:
 
 
 53
 In the case of a plea agreement that includes the dismissal of any charges or an agreement not to pursue potential charges [Rule 11(e)(1)(A) ], the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing.
 
 
 54
 U.S.S.G. § 6B1.2, p.s. (Nov. 1990) (emphasis added).
 
 
 55
 Liera's plea agreement provided that he would plead guilty to a felony information charging him with the unlawful use of a communication facility in order to facilitate a drug transaction. The agreement further stipulated that he would receive a maximum four year sentence in exchange for the dismissal of counts one and three of the indictment charging Liera with possession and conspiracy to distribute cocaine. It clearly stated that the district court could reject the plea.
 
 
 56
 The district court judge did not abuse his discretion in rejecting Liera's plea agreement. He complied with both the Guidelines and case law in rejecting the plea. Pursuant to the Guidelines, he determined that the remaining charges did not adequately reflect the seriousness of the offense conduct charged in the indictment. After reviewing the presentence report and considering the extent to which Liera was involved in the crimes charged, it was within his discretion to conclude that dismissing both the possession and conspiracy charges in exchange for a guilty plea to the unlawful use of communication facilities did not adequately reflect the seriousness of Liera's criminal conduct. See United States v. Castro-Cervantes, 927 F.2d 1079, 1082 (9th Cir.1990) (stating sentencing court should not accept plea agreement if remaining charges do not adequately reflect seriousness of defendant's behavior).
 
 
 57
 The record is replete with the judge's statements regarding the discrepancy between Liera's version of events and the evidence presented to him. At sentencing, the judge again expressed his reasons for rejecting the plea, including the fact that Liera's testimony concerning his activities did not comport with the judge's understanding of the record. He concluded that Liera's activities were more extensive than what the plea reflected and that it was not in the interest of justice for him to accept the plea agreement.
 
 
 58
 Liera relies upon United States v. Miller, 722 F.2d 562 (9th Cir.1983), in support of his claim that the district court judge improperly rejected his plea agreement. However, in that case, the district judge had implemented a categorical rule limiting charge bargains. Id. at 563. This court held that such a broad policy governing charge bargains is impermissible. Id. at 564-65. Miller reasoned that because the acceptance or rejection of a plea agreement requires the district court to exercise its discretion, categorical rules effectively eviscerate that discretion, and therefore they are improper. Id. at 565. In the present case, far from implementing a broad policy to reject pleas, the district court judge spent a considerable amount of time deciding whether to accept the plea agreement. Therefore, we affirm the district court's decision to reject the plea agreement.
 
 B. Base Offense Level
 
 59
 Liera makes the same argument as Dessens. He claims that the district court erred in setting his offense level at thirty-six based upon a conspiracy capable of producing fifty kilograms of cocaine. We reject Liera's argument for the same reasons set forth supra Section II.D. The record indicates Liera was one of the co-conspirators who kept insisting they could produce the additional thirty-two kilograms. Therefore, because the co-conspirators had both an intent to deliver and the capability of producing fifty kilograms of cocaine, the district court did not clearly err in setting Liera's base offense level based upon that amount.
 
 C. Role in the Offense
 
 60
 Liera next contends the district court erred in increasing his offense level by two. We reject this argument.
 
 
 61
 We review for clear error the district court's finding that a defendant is "an organizer, leader, manager, or supervisor" of criminal activity under U.S.S.G. § 3B1.1(c). Monroe, 943 F.2d at 1019.
 
 
 62
 A defendant's offense level is increased by two if he "was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1(c) (Nov. 1990).[3] The sentencing court may consider the following factors in determining whether to increase the offense level based upon the defendant's role in the offense: (1) decision-making authority, (2) nature of participation in the offense, (3) recruitment of accomplices, (4) claimed right to a larger share of the fruits of the crime, (5) degree of participation in planning or organizing the offense, (6) nature and scope of the illegal activity, and (7) degree of control and authority exercised over others. Id. § 3B1.1, comment. (n. 3).
 
 
 63
 Liera claims the Government made the best argument against any increase in Liera's offense level when it argued against a four-level increase in its response to Liera's presentence report objections. However, the Government subsequently urged a three-level increase in its supplemental response. Contrary to Liera's assertion, the two documents are not inconsistent. In its first response, the Government objected to a four-level increase because the evidence did not justify finding that Liera was an organizer or leader of the conspiracy. The supplemental response requested a three-level enhancement based upon Liera's role as a manager involving five or more participants pursuant to U.S.S.G. § 3B1.1(b). Nonetheless, the Government still maintained that Liera was not a leader or organizer.
 
 
 64
 Notwithstanding the Government's supplemental response, the district court rejected its three-level enhancement recommendation and increased the offense level by two pursuant to § 3B1.1(c). The district court did not clearly err when it did so. The record reflects Liera's role as an organizer or manager in accordance with the provisions of § 3B1.1(c).
 
 
 65
 The main factor outlined in the Guidelines which supports the two-level increase is "the degree of participation in planning or organizing the offense." U.S.S.G. § 3B1.1, comment. (n. 3). Liera planned, organized and coordinated the drug transaction. When the informant met Lopez, Lopez told him that the contact person was Liera. Liera managed Dessens' activity. Moreover, the agents observed Liera making and receiving phone calls to keep himself informed about the status of the delivery. Therefore, we affirm the two-level increase because the district court did not clearly err in enhancing Liera's offense level based upon his role in the offense as a manager or organizer.
 
 D. Statement of Reasons
 
 66
 Liera's final contention urges this panel to remand this case to the district court for resentencing because it failed to state reasons for imposing the 262-month sentence against Liera in accordance with 18 U.S.C. § 3553(c)(1).
 
 
 67
 This court reviews de novo both the application of the Sentencing Guidelines, United States v. Lockard, 910 F.2d 542, 543 (9th Cir.1990), and the issue of whether the district court failed to state its reasons for sentencing within a certain Guideline range. United States v. Upshaw, 918 F.2d 789, 792 (9th Cir.1990), cert. denied, 111 S.Ct. 1335 (1991).
 
 
 68
 A sentencing court must make an adequate statement of its reasons for choosing a particular sentence within the sentencing range where that range exceeds twenty-four months. 18 U.S.C. § 3553(c)(1);[4] Upshaw, 918 F.2d at 792. The statement of reasons must include a discussion of certain factors the court relied upon in setting a particular sentence within the Guideline range, including "individual considerations of background, character, and conduct, as well as the systematic goals of deterrence, rehabilitation, and consistency in sentencing." Upshaw, 918 F.2d at 792; see also U.S.S.G. § 1B1.4 (Nov. 1990).
 
 
 69
 In Upshaw, the district court had stated that it was " 'not going to sentence at the upper limits, but rather in the mid range in accordance with the court's customary procedure in this matter.' " Id. This court held that the above statement of reasons was inadequate for purposes of imposing a certain sentence within the Guidelines range. Id.
 
 
 70
 In the present case, because the guideline range was 235 to 293, the district court was required to state its reasons for imposing a 262-month sentence. We do not remand for resentencing because the district court judge adequately stated his reasons for imposing the sentence throughout the sentencing proceedings in accordance with the principles set forth in Upshaw, with respect to background, character, conduct, and consistency in sentencing. Upshaw, 918 F.2d at 792.
 
 
 71
 First, the judge considered Liera's character. He did not believe Liera was credible, and in fact believed Liera had lied about his involvement in the conspiracy. Second, the judge discussed Liera's criminal conduct. He stated that he believed Liera was not a leader; rather, he was a middle-man. He noted Liera's presence during various stages of the drug transaction. Moreover, he found no basis for Liera's request for a two-point reduction for acceptance of responsibility, considering the magnitude of the conspiracy, his participation and activities, his lack of remorse, and his misrepresentation with respect to his acts and activities in statements made to the district court.
 
 
 72
 Third, the judge considered Liera's background. Liera's wife and mother testified at sentencing about Liera's family and work history. Finally, he was cognizant of consistency in sentencing because he considered the 262-month sentence imposed upon codefendant Dessens. Therefore, because the record adequately reflects the fact that the district court judge considered and discussed the factors outlined in Upshaw and in U.S.S.G. § 1B1.4, we decline to remand to the district court for a statement of reasons.
 
 IV.
 MARTINEZ
 A. Authentication
 
 73
 Martinez claims a Pactel pager was improperly admitted into evidence because it was not authenticated.
 
 
 74
 We review for abuse of discretion the district court's determination that there was sufficient evidence of authenticity to satisfy Fed.R.Evid. 901(a). United States v. Vasquez, 858 F.2d 1387, 1392 (9th Cir.1988), cert. denied, 488 U.S. 1034 (1989).
 
 
 75
 "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). The Government need only make a prima facie showing of authenticity; however, this court requires strict compliance with authenticity rules. Vasquez, 858 F.2d at 1392.
 
 
 76
 Moreover, as the Tenth Circuit has noted, authenticity is a
 
 
 77
 preliminary issue of admissibility [and] is for the court to decide--it must ascertain whether there is a reasonable probability that the evidence has not been altered in any material aspect since the time of the crime and that it reasonably has a tendency to establish facts of consequence in the action as more probable than they would be without the evidence.
 
 
 78
 United States v. Brewer, 630 F.2d 795, 802 (10th Cir.1980) (absent clear abuse of discretion, the district court's decision regarding authentication will not be disturbed).
 
 
 79
 In this case, there was sufficient evidence for the district court to conclude that the pager was what the Government claimed, i.e., a pager seized from Martinez. The Government established a chain of custody from the time Martinez was arrested up to the date it was admitted into evidence. Rocky Franklin, an officer from the Phoenix Police Department, arrested both Martinez and Pedro Garcia and seized pagers from their persons. He testified that he had placed the pagers in separate plastic bags and labeled each bag with the name of the corresponding defendant.[5]
 
 
 80
 The pager seized from Martinez was then taken from the scene of the arrest to the Maricopa County jail where it was inventoried and placed in a property locker. Drug Enforcement Administration (DEA) Agent Charles Gullick asked Task Force Agent Sands to retrieve any evidence from the county jail which had been seized from the defendants arrested on November 15, 1990. Agent Sands obtained a Pactel (Motorola) pager, from the Martinez's property locker at the county jail. He left a DEA-12 inventory receipt (DEA receipt) in the property locker indicating that he had removed the pager. He also placed a copy of the DEA receipt in the plastic bag containing the pager which he then delivered to Agent Gullick on November 26, 1990. Agent Sands identified Exhibit 19-A, the Pactel (Motorola) pager, as the pager he had retrieved from the Maricopoa County jail because he compared the serial numbers on Exhibit 19-A with the serial number of the DEA receipt. Agent Gullick maintained custody of the pager until December 15.
 
 
 81
 Admittedly, an error occurred when Agent Humberto Rodriquez was filling in while Agent Gullick was on vacation. Apparently, all the evidence which was to be admitted at trial was placed on a table which Agent Rodriquez understood had been seized from the East Kiowa house. He then marked Exhibit 19 (the evidence bag containing Exhibit 19-A, the pager) as having been seized from the Kiowa house.
 
 
 82
 However, notwithstanding this error in marking the evidence bag, there was sufficient evidence to establish its authenticity and to conclude the pager was the one seized from Martinez. As well as the chain of custody evidence noted above, Agent Gullick, who had conducted a search of the Kiowa house on November 19, 1990, testified that no pagers had been seized from the Kiowa house. Therefore, the district court properly admitted the pager.
 
 
 83
 Having established that the pager was properly admitted, the jury was thereafter free to weigh the evidence accordingly:
 
 
 84
 "identification of physical evidence, and its connection to a particular defendant, may be shown through either circumstantial or testimonial evidence.... [L]ack of possible identification, or proof of connection, affects the weight of the evidence rather than its ultimate admissibility once the preliminary issue of admissibility is determined." See Brewer, 630 F.2d at 802 (citation omitted). Hence, we conclude the district court did not err in ruling that the Government properly authenticated the pager.
 
 B. Sufficiency of Evidence
 
 85
 Finally, Martinez argues there was insufficient evidence to convict him for possession and conspiracy with intent to distribute eleven kilograms of cocaine. However, this assertion is contrary to the record.
 
 
 86
 "The evidence is sufficient to support a conviction if any rational juror, viewing the evidence in a light most favorable to the government, could have found the essential elements of the crime beyond a reasonable doubt." United States v. Torres-Rodriguez, 930 F.2d 1375, 1386 (9th Cir.1991). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991).
 
 
 87
 (1) Conspiracy
 
 
 88
 The existence of a conspiracy requires proof of three elements: (1) an agreement to accomplish an illegal objective; (2) one or more acts in furtherance of the illegal goal; and (3) intent to commit the underlying substantive offense. United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987). The informant's testimony establishing an agreement for the purchase of fifty kilograms of cocaine, coupled with the conduct of the defendants in furthering the illegal objective of the conspiracy, is ample to support the existence of a conspiracy.
 
 
 89
 Once the existence of a conspiracy is established, it is enough to convict a defendant of knowingly participating in that conspiracy if evidence of even a slight connection is proven beyond a reasonable doubt. Id.; United States v. Sanchez-Mata, 925 F.2d 1166, 1167 (9th Cir.1991). Such a slight connection may be inferred from circumstantial evidence; however, "[m]ere proximity to the scene of a crime is not sufficient to establish a connection to the conspiracy, but acts that otherwise appear innocent, when viewed in context, may support an inference of guilt." Mares, 940 F.2d at 458.
 
 
 90
 In this case, there was sufficient evidence to connect Martinez to the conspiracy. Agent Rodriquez testified that he had followed Dessens and Liera driving a white Ford car when they entered the Fry's Food Store parking lot. He observed them exit the vehicle and walk to public pay phones where they placed a call at approximately 7:00 p.m. on November 15, 1990. There was testimony by Kathy Romeo, a service representative and custodian of records at U.S. West Communications, that at 6:54 p.m. on that same date, a call was placed to a Pactel pager with the number 251-1335 from a public phone at Fry's Food Store where Dessens and Liera were located. That Pactel pager number matched the one subsequently seized from Martinez when he was arrested.
 
 
 91
 Soon after the call, DEA Special Agent Anthony Garcia observed a Chevy Blazer arrive at the Fry's parking lot where Dessens and Liera motioned them to come over to the front of the store where they were standing. Special Agent Garcia identified the driver of the Blazer, Pedro Garcia, and Martinez, the passenger. Martinez remained in the Blazer while Dessens retrieved a white styrofoam cooler with a "Circle K" logo on it from the Blazer and placed it in the trunk of the white Ford. Furthermore, Agent Rodriquez testified that Martinez handed Dessens the white cooler. Agent Garcia followed the white Ford to the Inn Suites Hotel where DEA Agent Cassillas opened the white cooler and found eleven kilograms of cocaine.
 
 
 92
 Martinez relies upon this court's decision in Sanchez-Mata where both the conspiracy and possession convictions were reversed. 925 F.2d at 1170. However, Sanchez-Mata does not require the reversal of Martinez's convictions because it is distinguishable in several respects. In Sanchez-Mata, this court noted facts which did not support his conspiracy conviction, including the fact that no drug transaction was underway at the time the defendant was arrested and that he was never seen touching the marijuana. Id. at 1167-68. Furthermore, the defendant had arrived at the market in a Toyota and left in the Audi where the marijuana was later discovered. Id. at 1168. The court in Sanchez-Mata found it significant that neither the trunk of the Audi nor the trunk of the Toyota were opened at the market; thus, because the defendant had only been a passenger in the both cars, there was insufficient evidence to convict for conspiracy and possession. See id. at 1167-70.
 
 
 93
 In Sanchez-Mata, the defendant was a passenger in the car where marijuana was seized. Similarly, Martinez was a passenger in the Blazer where the cocaine was located before it was transferred to the trunk of the Ford and later seized. However, unlike Sanchez-Mata, Martinez was present in the Blazer when the cocaine was transferred to the white Ford. In fact, there was evidence that he was the one who handed the cooler to Dessens. Hence, unlike the defendant in Sanchez-Mata, Martinez was present while the drug transaction was underway.
 
 
 94
 Moreover, the fact that he communicated with his co-conspirators through the pager is sufficient circumstantial evidence to establish his connection to the conspiracy. United States v. Disla, 805 F.2d 1340, 1352 (9th Cir.1986) (phone calls provide circumstantial evidence sufficient to connect defendant to conspiracy and help support his conspiracy conviction). Therefore, there was sufficient evidence to prove that Martinez was connected to the conspiracy, even if that connection was only slight, and even if it was inferred from circumstantial evidence. Mares, 940 F.2d at 458.
 
 
 95
 (2) Possession with Intent to Distribute
 
 
 96
 "Possession of a controlled substance under section 841(a)(1) may be constructive, as well as actual." Disla, 805 F.2d at 1350 (internal quotations omitted). Constructive possession may be established by direct or circumstantial evidence and includes evidence that the defendant had the power to dispose of the drug; the ability to produce the drug; exclusive control or dominion over the property where the drug was found; or, where the defendant participates in a "joint venture" to possess a controlled substance. Id.
 
 
 97
 Moreover, three additional legal theories support a conviction for possession: (i) co-conspirator liability; (ii) aiding and abetting; or, (iii) exercising dominion and control over the drugs. Mares, 940 F.2d at 460. In Mares, this court affirmed the possession convictions under the first theory, stating: "It is undisputed that the appellants' two codefendants possessed heroin with intent to distribute; therefore, having affirmed the appellants' conspiracy convictions, ... we affirm the convictions for possession with intent to distribute." Id. This court reasoned that because the appellants' co-conspirator possessed the drugs in furtherance of the conspiracy, they were properly responsible for possession. Id. (citing United States v. Crespo de Llano, 838 F.2d 1006, 1019 (9th Cir.1987)).
 
 
 98
 Because there was sufficient evidence in this case to convict Martinez for conspiracy, we affirm his possession conviction pursuant to the co-conspirator liability theory. See Mares, 940 F.2d at 460. After viewing the evidence in the light most favorable to the Government, a reasonable jury could have found Martinez guilty beyond a reasonable doubt of both conspiracy and possession.
 
 V.
 CORONADO
 A. Airline Tickets
 
 99
 Coronado contends that the district court erred in admitting certain airline tickets and boarding passes into evidence, and that because such evidence was the strongest evidence the Government had against him, it was not harmless when there was otherwise insufficient evidence to support his conspiracy conviction.
 
 
 100
 The district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Rohrer, 708 F.2d 429, 432 (9th Cir.1983). A nonconstitutional error does not require reversal unless it is more probable than not that it affected the verdict. Id. We also review for abuse of discretion the district court's balancing the probative value of evidence with its prejudicial effect. United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989). "In deciding whether the prejudicial effect of the evidence outweighs its probative value, trial courts are given wide discretion." United States v. Smith, 893 F.2d 1573, 1579 (9th Cir.1990).
 
 
 101
 (1) Relevance
 
 
 102
 Only relevant evidence is admissible.[6] Fed.R.Evid. 402. This court has held that evidence seized at a stash house is relevant to show an overall drug trafficking conspiracy, including firearms, cash, a mobile phone, pagers, and receipts for cash purchases of vehicles and weapons. Crespo De Llano, 838 F.2d at 1018; see also United States v. Huguez-Ibarra, 954 F.2d 546, 553 (9th Cir.1992) (car payment receipt found in same room cocaine was found admissible). Furthermore, such evidence was admissible against a codefendant even though he did not live at the residence where the evidence was seized because that evidence was material to show the existence of a conspiracy. See Crespo De Llano, 838 F.2d at 1019-20.
 
 
 103
 Similarly, in the instant case, the airline ticket receipts and boarding passes were seized at the Kiowa stash house and were relevant to connect Coronado to the conspiracy. One ticket showed Coronado taking a trip from Bogota, Columbia, to New York and from Miami to Cancun, Mexico, on September 25, 1990. Another ticket in Coronado's name indicated he had traveled from Miami to Dallas and from Phoenix to Dallas to Miami on September 17, 1990.
 
 
 104
 The tickets were especially relevant because the informant had testified that Coronado was involved in packaging the cocaine in Mexico and sending it to the United States. They linked Coronado to the co-conspirators because they were found at the Kiowa stash house. Furthermore, like the receipts for cash purchases in Crespo De Llano, these ticket receipts indicated activities in furtherance of an ongoing conspiracy. Crespo De Llano, 838 F.2d at 1018 (evidence relevant to aims and existence of conspiracy admissible (citing United States v. Uriarte, 575 F.2d 215, 218 (9th Cir.), cert. denied, 439 U.S. 963 (1978))); see also United States v. Sanchez-Lopez, 879 F.2d 541, 555 (9th Cir.1989) (presence of false compartment in glove compartment and perfume odor relevant and admissible circumstantial evidence to substantiate conspiracy charge).
 
 
 105
 Coronado argues the evidence was not relevant because the ticket dates (September 17 & 25, 1990, and October 11, 1990) were prior to the date the drug transaction occurred (November 15, 1990). However, the indictment alleges an ongoing conspiracy on or about January 1, 1990, through November 15, 1990. Thus, because the tickets were dated during the alleged conspiracy period, they were relevant. Rohrer, 708 F.2d at 435 (items admissible even though found more than a year after date Government alleged as date conspiracy ended).
 
 
 106
 (2) Rule 403 balancing
 
 
 107
 Once the district court makes the initial determination that the evidence is relevant, it must then engage in the balancing test pursuant to Rule 403.[7] As outlined above, the probative value was significant. It was even more relevant when viewed in light of the informant's testimony regarding Coronado's involvement in the drug negotiations.
 
 
 108
 Coronado was present at a meeting which occurred on approximately November 8, 1990. Liera told the informant that Coronado was a friend of his. At that meeting, Coronado said he was comfortable with the deal and for the informant not to worry about the quality of the cocaine because he had experience in packaging the cocaine in Mexico and sending it to the United States; thus, he could guarantee its quality. The district court engaged in the requisite Rule 403 balancing and we find that it did not abuse its discretion in concluding that the probative value of the evidence outweighed its prejudicial value.
 
 B. Sufficiency of Evidence
 
 109
 Coronado also makes a sufficiency argument. However, because he failed to make a motion for acquittal either at the close of the Government's case or at the close of all evidence, he has waived that issue on appeal. United States v. Comerford, 857 F.2d 1323, 1324 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). Nonetheless, when the sufficiency issue is waived, this court reviews for plain error to prevent a miscarriage of justice. United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied, 112 S.Ct. 947 (1992).
 
 
 110
 In this case, no plain error occurred because there was sufficient evidence to convict Coronado of conspiracy. Id. (no plain error when there is ample evidence to support charges). As well as the evidence noted above, Agent Rodriquez testified that when he went to the Kiowa stash house on November 15th after the arrest at the Inn Suites Hotel, he saw Coronado there. Coronado produced an Arizona photo I.D. card in response to Agent Rodriquez's request for documentation which listed the East Kiowa address on it. The informant's testimony concerning Coronado's presence during the drug negotiations, coupled with his presence at the stash house the day the drug deal occurred and his Arizona I.D. card stating the Kiowa address, was sufficient evidence to convict him for conspiracy.
 
 C. Motion for Mistrial
 
 111
 Coronado next claims that the district court erred in not granting his motion for mistrial after counsel for codefendant, Liera, stated during his opening statement that Dessens "had already met his fate." We reject this argument.
 
 
 112
 The district court's decision denying a motion for mistrial is subject to an abuse of discretion standard. United States v. Homick, 964 F.2d 899, 906 (9th Cir.1992).
 
 
 113
 Coronado is accurate in stating that the guilty plea of a codefendant is inadmissible as substantive evidence of the defendant's guilt. United States v. Solomon, 795 F.2d 747, 748 (9th Cir.1986); Baker v. United States, 393 F.2d 604, 614 (9th Cir.), cert. denied, 393 U.S. 836 (1968). However, there are several problems with his argument. First, he inaccurately characterizes the codefendant counsel's opening statement as a "guilty plea."[8] It was an ambiguous and isolated statement. The fact the Dessens "had already met his fate" could mean several things, none of which became apparent through subsequent statements. In fact, Dessens did not plead guilty; rather, he had been convicted of possession and conspiracy by a jury on March 7, 1991. Second, the statement was not "evidence" of a guilty plea and was not used to prove Coronado's guilt.
 
 
 114
 Consequently, Coronado's reliance upon cases in which evidence of a codefendant's guilty plea has been admitted is misplaced. Moreover, this court will only reverse for misconduct "if it appears more probable than not that the misconduct in question materially affected the jury's verdict." United States v. Nadler, 698 F.2d 995, 1001 (9th Cir.1983). "This court must give great deference to the District Court's handling of the alleged misconduct during trial, since that court is in a better position to understand the circumstances surrounding the incident and to evaluate its impact." Id.
 
 
 115
 In this case, the judge was in the best position to consider the impact of the opening statement within the context of the trial and ultimately he denied the motion. As noted in the previous section, there was sufficient evidence to convict Coronado for conspiracy that even if error occurred, it did not materially affect the jury's verdict. Therefore, the district court did not abuse its discretion in denying Coronado's motion for mistrial.
 
 CONCLUSION
 
 116
 For all of the foregoing reasons, the judgments of the district court as to each of the defendants are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Most of the cases the parties rely upon involve the issue of whether error occurred due to comments upon the defendant's failure to testify as opposed to his post-arrest silence. Although the principles are analogous and the cases instructive, the issues are technically different. See United States v. Espinosa, 827 F.2d 604, 616 (9th Cir.1987), cert. denied, 485 U.S. 968 (1988)
 
 
 [2]
 Because the applicable Guidelines are determined as of the date of the crime, the November 1990 Guidelines apply in this case. See Miller v. Florida, 482 U.S. 423 (1987)
 
 
 [3]
 Subsection (a) provides for a four level increase in the offense level if the defendant was an organizer or leader of criminal involving five or more participants. U.S.S.G. § 3B1.1(a). Subsection (b) provides for a three level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Id. at § 3B1.1(b)
 
 
 [4]
 Section 3553(c)(1) provides that:
 The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--
 (1) is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range....
 18 U.S.C. § 3553(c)(1).
 
 
 [5]
 It appears from the record that Franklin labeled the separate bags with the name of the respective defendant rather than labeling each bag with both defendants' names
 
 
 [6]
 " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401
 
 
 [7]
 Fed.R.Evid. 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 [8]
 During opening statement, counsel for Liera said, "There are three Oscars in this case. And I want you to keep this in mind. And you will hear this
 There is an Oscar Liera, he was here. There is an Oscar Lopez, who was with the informant and set this whole transaction up. And there is an Oscar Dessens, who has met his fate already."